# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JOBEANA T. PERRY, ex rel. N.P., a minor, | |
| Plaintiff, | No. 13 C 6647 |
| v. | Magistrate Judge Mary M. Rowland |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Jobeana Perry filed this action on behalf of her minor daughter, N.P., seeking reversal of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*; 42 U.S.C. § 1382c(a)(3). The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has filed a request to reverse the Administrative Law Judge's (ALJ) decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 976-77 (N.D. Ill.

2001).[1] A child qualifies as disabled and therefore may be eligible for SSI if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and the impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). To determine whether a child under the age of 18 is disabled within the meaning of the Act, the ALJ applies a three-step evaluation. 20 C.F.R. § 416.924(a). The ALJ must inquire whether: (1) the child is engaged in substantial gainful activity; (2) the child has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; and (3) the child has an impairment or combination of impairments that meets, medically equals, or functionally equals a listing in the Listings of Impairments contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

To functionally equal the listings, the ALJ must find an "extreme" limitation in one category or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete ac-

---

[1] The regulations governing the determination of disability for Disability Insurance Benefits (DIB) are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for SSI. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

tivities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when a child's "impairment(s) interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## II. PROCEDURAL HISTORY

Jobeana Perry filed an application on February 17, 2011, for SSI on behalf of N.P., her minor daughter, alleging she became disabled on January 19, 2011, due to type I diabetes and asthma. (R. at 48, 98). The application was denied initially on April 14, 2011 (*id.* at 53), and upon reconsideration on June 16, 2011. (*Id.* at 54). Ms. Perry and N.P. appeared and testified at a hearing on March 21, 2012, in Chicago, Illinois, before an ALJ. (*Id.* at 26-47). Neither Ms. Perry nor N.P. was represented by counsel. On April 23, 2012, the ALJ issued a decision denying benefits. (*Id.* at 10-21). The Appeals Council denied Plaintiff's request for review on July 18, 2013. (*Id.* at 1-3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

Applying the three-step sequential evaluation process, the ALJ found, at step one, that N.P. has not engaged in substantial gainful activity since February 17, 2011, the application date. (R. at 13). At step two, the ALJ found that N.P. had the following severe impairments: diabetes mellitus and asthma. (*Id.*). At step three, the ALJ determined that N.P. does not have an impairment or combination of impairments that meets, medically equals or functionally equals the severity of one of the listed impairments enumerated in the regulations. (*Id.*). The ALJ determined

that N.P. had less than "marked" limitations in the ability to care for herself, and a marked limitation in health and physical well-being. (*Id.* at 19-20). The ALJ found no limitations in the other domains. The ALJ concluded that N.P. has not been disabled, as defined in the Act, since February 17, 2011. (*Id.* at 20).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of

the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

N.P. was born on May 13, 2004, and was seven years old at the time of the ALJ's decision. (R. at 98, 21). On January 18, 2011, N.P. saw her primary care physician and complained of excessive thirst and frequent urination. (R. at 188). The physician noted asthma, which N.P. has had since birth, and ordered allergy and diabetes testing. (R. at 40-41, 188, 210). January 19, 2011 test results and blood work showed N.P.'s serum glucose level at 591 (65 to 99 noted as normal range) (R. at

193) and her urine had trace ketones.[2] (R. at 194). On February 7, 2011, when Ms. Perry returned with N.P. for test results, N.P. was taken to the emergency room for hyperglycemia and then admitted as an inpatient for insulin replacement therapy at the University of Illinois at Chicago Medical Center (UIC) for two days. (R. at 189, 210). Ms. Perry received extensive diabetic education including blood sugar testing technique; insulin drawing and injection technique; glucagon drawing and injection technique; urine ketone testing; symptoms and courses of action for low and high blood sugar levels; insulin dose calculations; impact of physical activity; counting of carbs; modification of insulin doses depending on N.P.'s response; a schedule of times throughout the day when blood sugar testing was necessary; snack criteria depending on blood sugar levels; severe hypoglycemia care; and when to call 911 for emergency assistance. (R. at 212-15). During this hospitalization, moderate persistent asthma was also noted, and N.P. was prescribed inhalers. (R. at 235).

At a follow-up on February 18, 2011 with the Pediatric Endocrinology Clinic at UIC, N.P. presented with a mostly fair blood glucose level, a few readings below 70 and "more than a few" above 300. (R. at 220). N.P.'s history of asthma and allergic rhinitis were also noted. (R. at 219). Ms. Perry was provided a detailed snack and insulin administration schedule with a target range for blood sugar set as 100 to 200; the amount of insulin required throughout the day depended on her blood sug-

---

[2] "Ketones in the urine is a sign that your body is using fat for energy instead of using glucose because not enough insulin is available to use glucose for energy." http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-for-ketones.html.

ar level and the amount of carbs that she ate; and snacks needed to be monitored in accord with blood sugar levels and physical activity. (R. at 223-26). Ms. Perry was instructed to watch for low and high blood sugar symptoms including confusion, grumpiness, sweating, feeling funny or weak, hunger, tiredness, shakiness, headaches, frequent urination, abdominal pain, nausea, vomiting, and dehydration. (R. at 225-26).

At a March 22, 2011 follow-up N.P. presented with increased hypoglycemia and she was below 80 "a lot"; blood sugar levels varied from a high of 489 to a low of 40 when she was playing; and she complained of headaches, tiredness, and stomach aches daily. (R. at 228-31). Notes indicate N.P.'s school only had a nurse on Friday, the school was not filling out the blood sugar log, and no one at school was making sure that she ate all of her lunch. (R. at 228). UIC sent a notice to the school nurse and principal stating N.P. will need her blood sugar levels checked before and after gym and she will need a snack after gym. (R. at 273).

At a follow-up on April 26, 2011, N.P. had lost some weight, but reported her appetite was improving; she was tired and sleepy in classes at school; and her feet hurt after long walks. (R. at 318-20). Ms. Perry expressed concern that the school nurse did not give insulin for meals or count carbs. (R. at 320). UIC issued notices to N.P.'s school to allow her to self-administer glucometer blood sugar testing and urine ketone testing under adult supervision. (R. at 311-12). N.P.'s school hired an agency nurse on April 28, 2011, "due to the extra care and monitoring required" at school. (R. at 146).

On May 24, 2011, Claudia Boucher-Berry, M.D., at UIC, reported N.P. continued to get occasional hypoglycemia after recess and would feel shaky, and had lost two pounds which needed to be monitored. (R. at 301-04). On July 19, 2011, Dr. Boucher-Berry noted N.P. received insulin injections four times a day and had to have her blood sugar checked six to eight times a day; she had to be monitored very closely for signs of hypoglycemia which might occur after an injection or during exercise; and she had to be monitored for signs of hyperglycemia and ketones which could be a sign of ketoacidosis. (R. at 339). Dr. Boucher-Berry opined that "[b]ecause of these extra precautions, [N.P.] does not function as a regular child." (*Id.*).

On September 20, 2011, Dr. Boucher-Berry issued an information letter for diabetic care at school and home, noting N.P. "is not capable of injecting her own insulin and needs to have adult supervision (school nurse or someone capable of managing Diabetes) at times of blood sugar checking and insulin administration." (R. at 348). She noted N.P. had not been eating lunch at school, and indicated she needs to eat lunch, especially if she received the insulin injection. (*Id.*). An October 18, 2011 "Physician's Report on Child with Diabetes" filled out by Dr. Boucher-Berry for N.P.'s school indicated that N.P. cannot perform her own glucose checks, insulin is required to manage her diabetes, and the student cannot give her own injections. (R. at 345). That same day, correspondence from the Pediatric Neurology Clinic at UIC to N.P.'s school noted that she should be allowed to take Ibuprofen daily for migraines and stomach aches. (R. at 361-64).

With respect to N.P.'s asthma, on April 28, 2011, she went to the Pediatric Asthma Clinic at UIC. Although N.P. has had asthma since birth, notes indicate her symptoms were getting worse with chest pain, coughing, and an itchy, sore throat. (R. at 294). In an August 3, 2011 follow-up for asthma, there was a significant decrease in Albuterol use and asthma symptoms were still getting worse. (R. at 340-43). She was diagnosed with moderate to severe asthma and perennial allergic rhinitis and conjunctivitis. (R. at 344). A September 13, 2011 note was sent to N.P.'s school indicating she should be permitted to use asthma medication before gym class or recess. (R. at 353).

### School Records

In March 2011, a 504 Plan[3] was issued indicating N.P. would have 225 direct service minutes with the school nurse.[4] In an April 8, 2011 504 Plan, both her diabetes and asthma were set forth as impairments significantly limiting one or more life activities. (R. at 274-75). The Plan noted the school nurse would provide direct services to N.P. for 225 minutes weekly, including daily supervised blood sugar checks at school before breakfast, lunch, snacks, gym, and as needed; insulin as needed to stabilize her blood sugar levels; monitoring on field trips and other out-

[3] "Every child with physician-documented acute or chronic condition requiring medication during school hours must be offered a 504 Plan to address the daily management of the chronic or acute condition and/or the prevention of reactions during school hours. In the event the student has an Individualized Education Program (IEP), the IEP shall address the prevention of reactions and daily management. The 504 Plan or IEP shall address how medication will be handled by school personnel, identifies what the school will do to accommodate the individual needs of the student requiring medication(s), and incorporates the Physician's instructions." Chicago Public Schools (CPS) Policy Handbook Online, http://policy.cps.edu/.
[4] This evidence is not in the record. The March 2011 504 Plan was mentioned in a letter dated May 5, 2011, from the school principal to Ms. Perry. (R. at 146).

side school activities; carbohydrate counting; and help with understanding the signs and symptoms to identify a hypoglycemic or hyperglycemic episode. (R. at 275-76). Additional school health support included rest periods; leaving the classroom five times for fifteen minutes per time for medication administration; class breaks five times for fifteen minutes per time for blood sugar monitoring; frequent washroom breaks; and instructions for staff to call 911 if an asthma attack was not relieved with a rescue inhaler. (R. at 276-77). In a subsequent 504 Plan on April 29, 2011, these directions were again set forth with the addition that the nurse should test for urine ketones when blood sugar is greater than 300 or if she is ill. (R. at 330).

A September 20, 2011 504 Plan was set forth with the previous directives and the following additions: must be accompanied to the nurse's office with adult supervision during glucose testing and walked back to class by receiving adult; testing accommodations include two stop-the-clock breaks; access to the elevator as needed; could carry a water bottle; use of Albuterol prior to gym or recess; and snacks in the classroom. (R. at 149-54). The nurse would provide direct services for 165 minutes weekly, and N.P. could leave four times a day for fifteen minutes for medication administration, and four times a day for fifteen minutes for blood sugar checks. (*Id.*). From August 8, 2011 to March 19, 2012, the school log showed her blood sugar level exceeded 180 more than 100 times and her blood sugar level was below 80 more than 18 times. (R. at 159-60).

## Non-Examining Consultants

On April 11, 2011, non-examining medical consultant, Julio Pardo, M.D., found N.P.'s asthma and diabetes mellitus were medically determinable impairments, but that they were not severe based on exams from July 2010 and February 2011. (R. at 48-52). On June 15, 2011, Dr. Deborah Albright, M.D., affirmed, noting the May 2011 exam from UIC was normal. (R. at 55-59).

## Jobeana Perry's Testimony

Ms. Perry testified that since February 2011, N.P. has had insulin dependent diabetes that needs to be closely monitored, including checking her blood sugar eight times a day and administering insulin throughout the day. (R. at 35-36). N.P.'s sugar levels affect her behavior; she is groggy when her levels are low; if levels are high, she will throw tantrums and cry; and she will not complete schoolwork when her sugar levels are too high or too low. (R. at 35-39). After her sugar levels were corrected, she would be sleepy. (R. at 38). N.P. sometimes gets frustrated with her diabetes and will sneak treats that she is not supposed to eat. (R. at 36, 40). She has severe migraines and has had asthma since birth for which she has an Albuterol inhaler and nebulizer. (R. at 40-41). Before gym class, she gets her sugar checked and takes Albuterol; after recess she sees the nurse. She is not allowed to walk to the nurse alone in case anything happens on her way to the nurse. (R. at 44). She cannot dress herself normally, but she can sometimes dress herself if her blood sugar is okay. (R. at 35, 44).

On February 17, 2011, Ms. Perry filled out a function report, noting N.P.'s impairments affect her behavior with other people, and if her sugar levels get too high or too low she is not able to behave properly. (R. at 118). In disability reports, she noted N.P.'s medication causes her throat to dry out, sores in her mouth, headaches, stomach aches, and eye sensitivity (R. at 126); N.P. "depends on parent for personal needs" (R. at 135); "she gets tired very easily and if her sugars get to[o] low, she gets seizures. Her sister and I help with her personal needs. She needs to be monitored frequently" (R. at 143); and at school she has a nurse that monitors her. (R. at 142).

## V. DISCUSSION

Plaintiff argues that: (1) the ALJ failed to consider whether Plaintiff's impairments were functionally equivalent to Listing 109.00C; (2) the ALJ did not set forth a basis for finding N.P. had a marked rather than an extreme limitation in the domain of "Health and Physical Well-Being"; (3) the ALJ did not set forth a supported rationale for finding a less than marked rather than marked limitation in the domain of "Caring for Yourself"; (4) the ALJ did not properly assess credibility; and (5) the ALJ erred by not properly developing the record given that Ms. Perry and N.P. were unrepresented and the ALJ did not obtain a valid waiver of counsel.

### A. Whether N.P.'s diabetes functionally equals Listed Impairment 100.09C.

Plaintiff asserts that the ALJ failed to address listing 109.00C, which addresses children with diabetes mellitus over age 6. (Mot. at 10).

Listing 109.00C provides that for children age 6 or older:

> [W]e follow our rules for determining whether the DM is severe, alone or in combination with another impairment, whether it meets or medi-

cally equals the criteria of a listing in another body system, or functionally equals the listings under the criteria in § 416.926a, considering the factors in § 416.924a. The management of DM in children can be complex and variable from day to day, and all children with DM require some level of adult supervision. For example, if a child age 6 or older has a medical need for 24–hour–a–day adult supervision of insulin treatment, food intake, and physical activity to ensure survival, we will find that the child's impairment functionally equals the listings based on the example in § 416.926a(m)(5).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 109.00C.

The ALJ concluded that N.P.'s "diabetes mellitus nor asthma do not, either singly or in combination, meet or medically equal one of the listed impairments." (R. at 13). As Plaintiff correctly asserts, the ALJ did not mention listing 109.00C in his decision. Nor is there any evidence that the ALJ even considered it. Further, Plaintiff argues that there is evidence that N.P. falls within this regulatory provision that directs a finding of disability if a child six or older cannot survive without full-time adult supervision of insulin treatment, food intake, and physical activity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 109.00C. The Court agrees.

The ALJ failed to explain why N.P. did not meet the criteria of functional equivalence for a child over the age of six who has diabetes pursuant to Rule 109.00C. Defendant concedes that the ALJ did not discuss why N.P. did not meet the functional equivalence of the listing for childhood diabetes, but argues that any error was harmless because there is no evidence in the record that "a brief absence of adult supervision would immediately threaten her life." (Resp. at 5). This is not persuasive and mischaracterizes the listing, which requires 24-hour supervision for medical reasons and does not require that a brief absence would immediately

threaten life. *See* 20 C.F.R. § 416.926a(m)(5); *Webster v. Colvin*, No. 1:12-CV-315-RLY-TAB, 2013 WL 5303742, at *3 (S.D. Ind. Sept. 19, 2013) ("Although the record does not explicitly state that failure to properly administer insulin, monitor food intake, or monitor physical activity is likely to result in significant or even fatal consequences, it is a reasonable inference that can be drawn from the record, which the ALJ should have confronted.").

Moreover, there is ample evidence in the record that N.P. required 24-hour-a-day adult supervision which the ALJ failed to consider. Without an explanation from the ALJ as to why he did not consider this evidence, the Court cannot conduct meaningful judicial review. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) ("[W]here the Commissioner's decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded.'") (internal citation omitted); *see also Scott*, 297 F.3d at 595 (remanding case because ALJ did not discuss or even reference the specific listing under which the plaintiff had applied for benefits). "By failing to discuss the evidence in light of [the specific listing's] analytical framework, the ALJ has left this court with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing." *Scott*, 297 F.3d 592.

The ALJ's lack of explanation or even consideration of this listing is particularly troubling given the evidence in the record supporting the need for 24-hour-a-day adult supervision of insulin treatment, food intake, and physical activity to ensure survival. With respect to insulin treatment, Ms. Perry administers the medication

at home, checking blood sugar levels six to eight times a day and giving N.P. insulin at least four times a day where she must calculate the dosage based on food consumption, blood glucose levels, and activity levels for that day. At school, a nurse is responsible for monitoring N.P.'s blood glucose levels and administering medication in accordance with specific instructions, and according to the 504 Plans, N.P. had between 165-225 direct service minutes with the school nurse per week. Medical records consistently indicate that N.P.'s blood sugar testing and urine ketone testing must be administered under adult supervision (*see, e.g.,* R. 311-12) and in a September 20, 2011 report, Dr. Boucher-Berry stated that N.P. "is not capable of injecting her own insulin and needs to have adult supervision (school nurse or someone capable of managing Diabetes) at times of blood sugar checking and insulin administration." (R. at 348). An October 18, 2011 Physician's Report indicated that N.P. cannot perform her own glucose checks, insulin is required to manage her diabetes, and the student cannot give her own injections. (R. at 345). Moreover, the school hired an agency nurse on April 28, 2011, "due to the extra care and monitoring required" at school. (R. at 146). *See Webster*, 2013 WL 5303742, at *2 (evidence that an adult was needed to administer medication showed the need for 24–hour–a–day adult supervision of insulin treatment to ensure survival).

With respect to N.P.'s food intake, there is evidence that N.P.'s blood sugar levels must be monitored, and the ALJ even acknowledged that N.P. is prone to "sneak food" detrimental to her condition. *See id.* at *3 (finding that ALJ should have considered Listing 109.00C where evidence showed child "sneaks snacks even though

she is not allowed, which impacts her blood sugar and insulin needs"). Ms. Perry was provided a detailed snack and insulin administration schedule and the amount of insulin required throughout the day depends on both N.P.'s blood sugar level and the amount of carbs that she eats. (R. at 223-26). Her snacks need to be monitored based on her blood sugar levels as well as activity levels. (R. at 224). According to the school 504 Plan, N.P. needs carbohydrate counting to determine the amount of insulin needed to control her blood sugar levels while at school. (R. at 276). Dr. Boucher-Berry noted that in cases of low blood sugar, there needs to be juice and snacks nearby, and that N.P. had been experiencing hypoglycemia secondary to not eating lunch at school. (R. at 348). Dr. Boucher-Berry iterated that N.P. needs to eat lunch, especially if she receives an insulin injection, and when N.P. lost weight she emphasized that this needs to be monitored. (R. at 301-04).

With respect to adult supervision of physical activity, the school records show that immediately before and after gym class or recess, she has to have her blood sugar checked and provided a snack after gym. (R. at 273). She has to be monitored for signs of hypoglycemia which might occur after an injection or during exercise. (R. at 301, 339).

In sum, the ALJ failed to analyze the above evidence in conjunction with the listed impairment for diabetes mellitus. The ALJ in this case did not adequately "build an accurate and logical bridge from the evidence to [the] conclusion" so that, as a reviewing court, we may assess the validity of the agency's final decision and afford N.P. meaningful review. *Scott*, 297 F.3d at 595. Because the ALJ failed to

confront and properly analyze the above evidence, his decision is not supported by substantial evidence.

**B. The ALJ did not set forth a basis for finding that N.P. had a marked limitation rather than an extreme limitation in Health and Physical Well-being.**

The ALJ found that N.P. had a marked limitation in health and physical well-being. (R. at 20). The ALJ noted "symptoms such as breathing problems, fatigue, and migraines that require ongoing treatment"; that her "impairments cause medical fragility requiring medical care"; and that she was directed to take Albuterol before participating in gym class. (*Id.*). He also noted that she receives nurse services at school, is permitted testing accommodations, can use the elevator, is allowed extra rest periods and washroom breaks, and can carry a water bottle. (*Id.*).

Plaintiff argues that the ALJ did not adequately consider the evidence and should have found that N.P. has a severe limitation in this domain, rather than marked. (Mot. at 9). Plaintiff asserts the ALJ failed to set forth his reasons for finding these restrictions to be marked and did not consider that N.P. requires repeated blood sugar checks and insulin injections throughout the day; sleep disruption due to asthma; fatigue that results in tiredness in class; migraine headaches that require both preventive and immediate acting medication; inhaler use especially with physical activity; and intensive monitoring of symptoms, including close supervision of eating and activity. (*Id.*). Further, Plaintiff argues that the ALJ did not set forth an explanation for finding N.P.'s frequent exacerbations of her uncontrolled diabetes marked by numerous hypoglycemic and hyperglycemic episodes did not meet the

requirement of an extreme limitation, pursuant to 20 C.F.R. § 416.926a(e)(3)(iv). (*Id.* at 11).

As already noted, the ALJ failed to consider an ample amount of evidence for Listing 109.00C. Similarly, much of that same evidence was not considered in the domain of health and physical well-being. Of particular concern is the ALJ's failure to rely on any physician's opinion or expert evidence in assessing this domain. In fact, the ALJ never mentions N.P.'s treating physician, Dr. Boucher-Berry, who opined that N.P. did not function as a regular child due to her extra precautions, including insulin injections four times a day, blood sugar checks 6-8 times a day, and close monitoring for signs of hypoglycemia, hyperglycemia, and ketones. (R. at 339). *See Roddy v. Astrue*, 705 F.3d 631, 636-37 (7th Cir. 2013) (failure to properly assess treating physician's evidence was reversible error). The Commissioner asserts that N.P. had normal functioning, and that all diabetic children require care. (Resp. at 6). However, the ALJ never considered the medical evidence indicating extensive supervision and Dr. Boucher-Berry's opinion to the contrary. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474. The ALJ's failure to evaluate evidence that supports Plaintiff's claim "does not provide much assurance that he adequately considered [Plaintiff's] case." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).[5] Additionally, the

---

[5] Nor did the ALJ consider the state agency opinions; however, as Plaintiff points out the state agency physicians did not review the entirety of the record. (Reply at 4; R. at 48-60). *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (error to rely on reviewing opinion that did not reflect proper consideration of entirety of claimant's condition).

ALJ could have requested expert medical testimony to assess N.P.'s limitations. Without any reliance on any medical assessments, it is difficult to ascertain how the ALJ came up with his medical opinions. *See Hopgood*, 578 F.3d at 702 (independent medical determination improper).

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). On remand, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. *Moon*, 763 F.3d at 721.

## C. The ALJ did not set forth a basis for finding that N.P. had a less than marked rather than a marked limitation in Caring for Yourself.

The ALJ found that N.P. has less than a marked limitation in her ability to care for herself. (R. at 19). The ALJ considered that she is unable to dress herself, requires the assistance of a personal nurse to check her blood sugar and administer insulin at school, and she sometimes indulges in food detrimental to her diabetes. (*Id.*).

Although the ALJ correctly addressed several relevant factors under this domain, he failed to consider N.P.'s inability to manage her meals and that she requires adult supervision to administer both her blood sugar checks and insulin. Dr. Boucher-Berry explicitly noted that N.P. cannot perform her own glucose checks, insulin is required to manage her diabetes, and that she cannot give her own injections. (R. at 345). Again, the ALJ did not consider the treating physician or her opinions in evaluating this domain. Further, although the ALJ acknowledged that N.P. consumes snacks detrimental to her diabetes, he did not mention that she had

not been eating lunch at school, and her physician indicated that she needs to eat lunch, especially if she receives an insulin injection. (R. at 348). Nor did the ALJ consider that N.P. requires someone to count her carbohydrates throughout the day. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007) ("Indeed, it is unclear what evidence the ALJ relied upon in finding that [N.P.] was not markedly limited in this domain. We require an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies."). The ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted).

## D. The ALJ's Credibility Determination

Plaintiff argues that the ALJ did not make express findings about the credibility of both Ms. Perry and N.P. In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of Social Security Ruling (SSR) 96–7p. *Giles*, 483 F.3d at 488-89. SSR 96–7p requires an ALJ to articulate the reasons behind credibility evaluations:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' [. . . ] The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96–7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996).

Here, the ALJ stated that "the medical and educational records do not demonstrate that there are limitations to the extent alleged by the claimant and her

mother" and "it appears that with [ ] treatment and accommodation, the claimant is essentially able to participate in age appropriate activities." (R. at 14-15). It is unclear, however, what portions of the testimony the ALJ rejected, if in fact he did reject any, or whether the ALJ credited the testimony of both N.P. and Ms. Perry. It is equally unclear what portions of the testimony Plaintiff takes issue with. In fact, it appears that the ALJ did credit parts of Ms. Perry's testimony by considering in his decision her testimony that N.P. cannot dress herself sometimes, she sneaks snacks, and that N.P. is performing adequately academically. However, the ALJ's conclusion that N.P. can "appropriately, effectively, and independently perform age-appropriate activities" (R. at 15) does not account for any of her limiting factors. If Ms. Perry or N.P.'s testimony were not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, Ms. Perry's testimony was credible, the ALJ was required to explain why the testimony did not support a finding that N.P. was limited to marked or extreme findings. *Giles*, 483 F.3d at 489 ("the ALJ was required to explain why the testimony did not support a finding that [claimant] was markedly limited in attending and completing tasks").

**E. Properly Developing the Record**

Plaintiff contends that the ALJ failed to obtain a valid waiver of representation when Ms. Perry and N.P. appeared and testified at the hearing without legal representation. When confronted with a *pro se* litigant, an ALJ must explain that (1) having an attorney present may help with the proceedings; (2) there is a possibility of free counsel or a contingency fee; and (3) attorneys' fees are limited to twenty-five

percent of past due benefits and require court approval. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Skinner*, 478 F.3d at 841. Here, the ALJ did not discuss the ways in which an attorney could assist her with the proceedings or the possibility of free counsel. Defendant argues that the ALJ can satisfy the *Binion* standard if no evidence suggests a claimant's incapability of reading and understanding a waiver that explains these elements. (Resp. at 3).

Prior to the hearing, Ms. Perry was given detailed written information that addressed attorney representation. (R. at 73-80). But in the Seventh Circuit, it is unclear whether such types of written materials can replace the oral admonishment. *See Gatewood ex rel. D.P. v. Astrue*, No. 10 C 283, 2011 WL 904864, at *9 (N.D. Ill. March 14, 2011) ("The Seventh Circuit has not directly addressed whether a claimant's receipt of written materials that sets forth the necessary elements is sufficient to establish a claimant's knowing waiver."). These materials might suffice, provided the ALJ "establishe[d] at the hearing that the claimant received, read and understood the notices." *Seamon v. Barnhart*, No. 05 C 13 C, 2005 WL 1801406, at *10 (W.D. Wis. July 29, 2005). *But see Dillard v. Barnhart*, No. 02 C 6251, 2003 WL 22478775, at *2 (N.D. Ill. Oct. 31, 2003) (holding that sending a pre-hearing letter did not relieve the ALJ of the hearing obligation to properly notify a claimant of the right to counsel).

In this case, the ALJ mentioned the written notice at the hearing. However, contrary to the Commissioner's assertion that "no evidence suggests that Plaintiff's mother had any mental illness that prevented her from understanding the waiver"

(Resp. at 3), Ms. Perry testified that she had a mental disability from a mood disorder (R. at 41-42) and medical records indicate she is bipolar and on medication for it. (R. at 266). The ALJ did not assess whether this impacted her understanding of the waiver. For this reason, Ms. Perry's waiver of counsel is invalid.

Because the waiver is invalid, the burden shifts to the Commissioner to show that the ALJ "fully and fairly developed the record." *Binion*, 13 F.3d at 245. Without a valid waiver, the ALJ's duty is heightened; he must "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Skinner*, 478 F.3d at 841–42. "While a claimant represented by counsel is presumed to have made his best case before the ALJ, no such presumption attaches to an unrepresented claimant." *Id.* at 842. Although the ALJ is required to "supplement the record . . . by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records," courts typically defer to the ALJ's judgment unless there has been a "significant omission." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). A significant omission is one that is prejudicial to the claimant. *Id.* To demonstrate prejudice, a claimant must "set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider," and "mere conjecture . . . is insufficient." *Id.*

Here, Plaintiff contends that the record before the ALJ was not adequately developed because at the hearing he did not question Ms. Perry when she mentioned N.P.'s fatigue and migraine headaches, and he did not follow-up on comments that N.P. snuck food detrimental to her diabetes and sometimes could not dress herself.

Plaintiff also asserts that the ALJ erred by not obtaining an expert opinion on N.P.'s condition. However, the ALJ discussed these factors in assessing N.P.'s limitations in the domains of "Caring for Yourself" and "Health and Physical Well-Being." (R. at 19-20). The ALJ's failure to question Ms. Perry further on these issues during the hearing, especially considering the ALJ factored them into his analysis in assessing N.P.'s limitations, is not a significant omission resulting in harm or prejudice to Plaintiff. Plaintiff has not set forth a specific piece of medical evidence relevant to her claim that the ALJ did not consider, *Nelson v. Apfel,* 131 F.3d 1228, 1235 (7th Cir. 1997), and the Court finds that the record was fully and fairly developed.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings [19] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: November 16, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge